NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| REGINA S. BAILEY,<br><br>              Plaintiff,<br><br>v.<br><br>JOSEPH GIBBONS, TANYA WOOD, DAVID WATKINS, ESQ., KELLY BURTON ROCCO, ESQ., PAT PRIANT, RUSSO REALTY, THE CITY OF ENGLEWOOD, AN UNKNOWN POLICE WOMAN, THORNTON WHITE, Englewood Police Officer, GONZALEZ, Englewood Police Officer, BARRETT, Englewood Lieutenant, and 2 UNKNOWN ENGLEWOOD POLICE OFFICERS,<br><br>              Defendants. | Civ. Action No. 09-4119 (KSH)<br><br><br><br>**OPINION** |

__KATHARINE S. HAYDEN, U.S.D.J.__

### I. Introduction

This case touches on several areas of law and involves numerous players. The central actor is plaintiff Regina Bailey, who sold her home in Englewood, New Jersey as part of the resolution of her divorce. Kelly Burton Rocco served as her attorney in connection with the court action that resulted in the forced sale of the house. The house was listed by Russo Realty, whose agent, Pat Priant, obtained the eventual buyers, Joseph Gibbons and Tanya Wood. Gibbons and Wood were represented by David Watkins during the sale. As explained in more detail below, Bailey remained on the property after the closing to clear her possessions out of the

house, and Gibbons subsequently called the police to have her removed.  City of Englewood police officers Thornton White and Anthony Gonzalez, as well as Lieutenant Kevin Barrett, responded to the call and briefly detained Bailey before letting her go.

Bailey instituted an action in New Jersey state court on January 13, 2009, asserting various state law causes of action against all of the above-named individuals and entities.  Judge Menelaos W. Toskos granted summary judgment to the City of Englewood and its police officers ("the Englewood defendants"), but allowed Bailey to file an amended complaint.  She did so on July 17, 2009, this time alleging federal and state constitutional claims against the Englewood defendants and asserting state law claims against the remaining defendants.  With the permission of the other defendants, the Englewood defendants removed the case to this Court, asserting federal question jurisdiction under 28 U.S.C. § 1331.  [D.E. 1.]

After discovery had been completed, all of the defendants moved for summary judgment [D.E. 77, 78, 79, 80, 95], and Bailey moved for summary judgment against all of the defendants [D.E. 83].  In addition, Rocco, who had unsuccessfully moved before Magistrate Judge Patty Shwartz to disqualify Bailey's counsel, James Marks, and for leave to amend her answer to file a third-party complaint against Marks, appealed Judge Shwartz's decision.  [D.E. 94.]

The only federal claims stated in Bailey's amended complaint are those asserted against the Englewood defendants.  As discussed below, those claims must be dismissed because the Englewood defendants are entitled to immunity, and the Court declines to exercise supplemental jurisdiction over the remainder of Bailey's claims.  *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 276 n.2 (3d Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)).  Because the Court opts not to exercise jurisdiction over Bailey's state law claims, this opinion relates only to her federal claims and to Rocco's appeal.  Accordingly, the following statement of facts relates only to the police incident.

The Court bases its analysis of Rocco's appeal on the statement of facts in Judge Shwartz's opinion [D.E. 92], and will review those findings of fact for clear error.  *See Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205, 213 (D.N.J. 1997).

## II. Summary of Facts[1]

As a result of a contentious divorce, Bailey was court-ordered to sell the home she lived in for 25 years, which was located at 166 Belmont Street in Englewood, New Jersey.  (Bailey Dep. 130:2–10.)  The closing occurred on December 27, 2008, and pursuant to an escrow agreement the parties executed, Bailey was given from the closing until January 4, 2008, to remove all of her possessions from the property.  (Bailey Dep. 19:19–21; Escrow Agreement, attached to Mory Certif. as Ex. I.)  The agreement provided that if she failed to do so by that date, the buyers, Gibbons and Wood, would have the right to employ a moving and cleaning company "to effectuate the house being delivered in a broom clean condition."  (Escrow Agreement)  The agreement also provided that the buyers could deduct from the amount held in escrow the pro-rata monthly interest they were obligated to pay under their mortgage from the closing date until such time as the property could be delivered in broom-clean condition.  (*Id.*)  These deductions cost Bailey approximately $50 per day.

Bailey did not remove her property from the house by January 4.  (Bailey Dep. 30:21–25.)  On January 7, Gibbons came to the property, and Bailey called the police "for help."  (Bailey Reply Certif. of Facts ¶ 66–68.)  Officer Jamie Gillert, who is not a defendant in this action, responded.  (Gillert Dep. 8:2–4.)  She told Bailey that she needed to be out of the house by the next morning, and she told Gibbons that he would need a court order to have Bailey

[1] These facts, and all reasonable inferences that can be drawn therefrom, are viewed in the light most favorable to Bailey.  *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011).

removed, in light of the fact that at the time he did not have documents proving his ownership of the house.[2]  (Gillert Dep. 11:8–21; Bailey Dep. 49:1–3; Bailey Reply Certif. of Facts ¶ 72.) Though movers came the next morning, Bailey did not have them remove all of her possessions from the property.  (Bailey Dep. 52:23–53:6, 56:5–23.)

On January 10, Bailey, who was 64 years old at the time, was admitted to the hospital; she stayed there until January 13 for treatment of diabetes and high blood pressure.  (Bailey Reply Certif. of Facts ¶ 85.)

On the morning of January 14, 2008, Bailey went to her former home and discovered a dumpster outside the house, filled with construction debris and some of her possessions.  (*Id.* ¶¶ 96–97.)  The door to the house was open, and Bailey could see workers inside breaking her dishes.  (*Id.*)  She began to take some of her possessions from the house and place them on a neighbor's lawn.  (*Id.* ¶ 99.)  She believed that the Escrow Agreement gave her the right to be on the property and reclaim her possessions.  (*Id.* ¶¶ 101–102.)

One of the workers called Gibbons, who in turn called the police, gathered all of the documents he thought he would need to prove his ownership of the property, and then drove to the property to meet the police there, with the intention of having Bailey removed.  (Gibbons Dep. 89:18–91:6, 115:5–13.)  Police officers Thornton White and Anthony Gonzalez responded in separate vehicles, arriving simultaneously at 9:50 a.m.  (White Dep. 9:19–22.)  White proceeded to talk to Gibbons, who showed the officer his deed to the property and his driver's license and told the officer that he had bought the house three weeks earlier and that, while Bailey was allowed on the premises for a certain period after the closing, at that time she was trespassing.  (Gibbons Dep. 92:16–20, 92:24–93:1; White Dep. 15:4–6, 23:16–19.)  For her part,

---

[2] Bailey does not assert any claims based on Gillert's visit to the property.

Bailey testified that although she did not see Gibbons show any documentation, it is possible that he did.  (Bailey Dep. 100:1–17.)  Gonzalez stated in his answers to interrogatories that during most of the officers' visit, Bailey was walking around the property, occasionally carrying some of her personal possessions.  (Gonzalez Interrogs. ¶ 7.)

After speaking to Gibbons, White attempted to talk to Bailey, but she ignored his questions.  (White Dep. 28:16–19, 28:23–25; Gonzalez Dep. 12:24–13:1, 13:6–8.)  She also did not show him any documentation, such as a lease agreement, that would establish her right to be on the property, and White unsuccessfully told her she needed to leave the property.  (White 65:22–24, 66:4–6; Gonzalez Dep. 9:17–22.)  White called Lieutenant Kevin Barrett and asked him to come to the property, hoping a higher-ranking officer could be more effective, but Bailey ignored Barrett, as well.  (Barrett Dep. 12:12–23, 32:13–19.)  After Barrett arrived, White filled him in on everything that had happened; Barrett subsequently asked Gibbons if he wanted to file a complaint against Bailey, and Gibbons responded that he did.  (Gibbons Dep. 119:18–120:5; Barrett Dep. 21:19–22.)  Barrett instructed White to arrest Bailey, and White took his handcuffs off of his belt, told Bailey to put her hands behind her back, and took hold of her wrists in order to put the handcuffs on her.  (Barrett Dep. 33:2–6, 33:14–18; Gibbons Dep. 121:3–10; Bailey Dep. 135:17–19.)  However, when Gibbons realized that filing a complaint meant Bailey would be handcuffed and taken to jail, he immediately told the officers that he did not want her arrested, but merely wanted her removed from the property.  (Gibbons Dep. 100:18–22, 101:8–14; Bailey Dep. 105:12–15.)  The police then let her go with a warning that she should not return to the property without first calling the police, and they also suggested that she seek legal counsel if she needed it.  (Bailey Dep. 109:24–110:4; Barrett Interrogs. ¶ 7.)

Bailey conceded in her deposition that only a few seconds elapsed from the time White removed the handcuffs from his belt to the time he released her.  (Bailey Dep. 135:2–136:7.) While she initially testified that her excessive force claims are premised on White's conduct in putting her hands behind her back and grabbing her wrists, she immediately corrected herself and stated that she moved her hands behind her back on her own.  (*Id.* 135:2–136:7.)  She also testified that White did not squeeze or punch her wrists, did not injure her, and never actually placed the handcuffs on her.  (*Id.* 105:5–8, 105:12–15, 135:2–136:7, 154:6–7.)  Indeed, she testified that she was never arrested.  (*Id.* 116:13–14.)  She also confirmed that the police did not take any of her possessions from the house.  (*Id.* 130:21–23.)  She added that "[m]aybe it was only a couple of seconds, but it was a scary couple of seconds."  (*Id.* 109:7–8, 135:2–136:7.)

Ten to fifteen minutes after the first incident, Bailey returned to the property, believing she had left her car keys behind.  (Bailey Dep. 110:19–25, 111:1–112:15.)  Remembering the police officers' advice, she called the police for assistance.  (*Id.* 32:6–9, 109:24–110:4.)  This time, White and Officer Johnson responded, and Johnson helped Bailey find her keys, which were hanging from her neck, underneath her sweater.  (Bailey Dep. 112:1–15.)

## III. Summary Judgment Standard

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if, under the applicable law, it could affect the outcome of the suit, and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  *Id.*  The mere existence of some disputed facts is insufficient to

defeat a motion for summary judgment.  *Id.*  When considering a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011).  However, in opposing a motion for summary judgment, a party cannot rest on the pleadings, but must set forth specific facts demonstrating the existence of a genuine issue of fact.  *United States v. 717 S. Woodward St.*, 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)).  The district court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.

## IV. Claims Against the City of Englewood

The City of Englewood contends that, under the rule set out in *Monell v. Department of Social Services*, it is immune from suit.  *Monell*, the seminal case on municipal liability, held that a municipality can be sued under 42 U.S.C. § 1983 only if the official conduct that caused the plaintiff's injury was the result of the municipality's policy or custom.  436 U.S. 658, 690 (1978).  A policy is defined as a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by" the municipality, *id.*, while a custom is defined as a course of conduct that, while not officially adopted, is so permanent and well settled "'as to virtually constitute law.'"  *Hansell v. City of Atlantic City*, 152 F. Supp. 2d 589, 609 (D.N.J. 2001) (quoting *Andrews v. City of Philadelphia*, 895 F. 2d 1469, 1480 (3d Cir. 1990)).  In addition to establishing the existence of a policy or custom, a plaintiff must establish a causal connection between the policy or custom and the injury suffered.  *Talbert v. Kelly*, 799 F.2d 62, 67 (3d Cir. 1986).  "[A] single incident of police misbehavior by a single policeman is insufficient as sole support for an inference that a municipal policy or custom caused the incident."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985).

7

The City of Englewood argues, in support of its motion for summary judgment, that Bailey "has not identified any policy, practice or custom implemented by a policymaker which existed on the date of [Bailey's] arrest," and that she has failed to establish a causal link between the policy and her injury.  (Englewood Defs.' Moving Br. at 31–32.)  Bailey responds with a host of counterarguments, none of which are sufficient to forestall a grant of summary judgment to the City of Englewood.

First, Bailey contends that the City of Englewood has a policy of inadequately training its officers to deal with landlord/tenant issues.  However, she provides no evidence of how the City of Englewood trains its officers, no indication of the specific training it failed to provide, and no suggestion of how providing that training could have reasonably prevented her injury.  "A § 1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur."  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991).  Simply showing that police officers could have been better trained is insufficient, *id.* at 1029–30, but that is all Bailey does here.  She thus cannot establish a *Monell* claim for failure to train.

Second, Bailey contends that in his police report, White (1) misstated the title of the statute pursuant to which Bailey was arrested, and (2) failed to include any mention of the documents he reviewed at the scene.  Her argument regarding the title of the statute—that it was changed when the statute was amended in 2005 and that White should have been aware of the change—is absurd.  The substance of the law was not changed in any way relevant to this case,

2005 N.J. Sess. Law Serv. Ch. 100 (West),[3] and even if White's error were more than a typo,

Bailey cannot base a *Monell* claim on a single policeman's mistake.  *See Tuttle*, 471 U.S. at 832.

The second argument is just as flimsy; Bailey contends that "[b]oth Lieutenant Barrett and Chief

O'Keefe admit this omission [of the documents White reviewed] was not proper policy."  (Opp'n

Br. to Englewood Defs. at 37 (quoting Pls.' Expert Report).)  This is tantamount to an

acknowledgment that whatever errors White made on his police report, they were not made

pursuant to a City of Englewood policy or custom and therefore cannot expose the City of

Englewood to liability.

　　　　Third, Bailey asserts that because White knew that Gillert had been called to the scene

previously, he should have called in to the station to review what had occurred at that prior

incident.  She suggests that his failure to do so was the result of a department-wide policy not to

radio back to the station.  Setting aside whether there is a causal connection between White's

failure to call back to the station and Bailey's alleged injury,[4] Bailey's assertion that the City of

Englewood has a policy of not calling back to the police station, made through her expert

witness, is incorrect.  What Englewood police Chief Arthur O'Keefe actually stated in his

deposition was that the fact that there had been a previous incident at the same location would

not necessarily be relevant to an officer on the scene, and that the officer would make the

decision whether to gather information about the previous incident "based upon the

circumstances and facts in front of him."  (O'Keefe Dep. 45:3–15, 46:9–23.)  He added that a

call back to the station might help provide a frame of reference, but is not imperative.  (*Id.*

---

[3] The amendment added "power generation facility, waste treatment facility, public sewage facility, water treatment facility, public water facility, nuclear electric generating plant [and] any facility which stores, generates or handles any hazardous chemical or chemical compounds" to the list of structures where unlicensed entry constitutes a fourth degree crime, rather than a disorderly persons offense.  2005 N.J. Sess. Law Serv. Ch. 100 (West)

[4] This discussion will be taken up *infra* with regard to the individual officers' motion for summary judgment.

46:20–23.)  Having failed to identify a policy mandating that White not call back to the station, Bailey cannot press a claim against the City of Englewood based on his failure to do so.

Fourth, Bailey asserts that the police department should have conducted an internal affairs investigation into the January 14, 2008, incident, and that its failure to do so gives rise to municipal liability.  For support she cites *Monaco v. City of Camden*, 2008 WL 408423 (D.N.J. Feb. 13, 2008).  There, Judge Simandle denied the city's motion for summary judgment, determining that the evidence demonstrated that the city repeatedly failed to conduct investigations into allegations of excessive force and that all of the investigations that did take place were aimed at shoring up the police department's defenses rather than rooting out police misconduct.  *Id.* at *14.  The critical difference between *Monaco* and this case is that in this case, Bailey has not provided any evidence that the City of Englewood has systematically failed to investigate allegations of excessive force—or any other alleged constitutional violation—such that the city can be deemed to be deliberately indifferent to the kind of injury Bailey claims to have suffered.  *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) ("[A] policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." (internal quotation marks omitted)).

In sum, Bailey has not offered any facts sufficient to hold the City of Englewood liable for the actions of its individual officers.  The City of Englewood is therefore entitled to summary judgment on all of the claims against it.

### V. Claims Against the Individual Police Officers

The individual police officers assert that they are entitled to qualified immunity, and that Bailey's § 1983 claims against them should therefore be dismissed.

### A. Qualified Immunity

Section 1983 provides a cause of action to any person who has been deprived of their federal rights by a person acting under color of state law.  However, "[w]hen an officer's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit."  *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005) "Qualified immunity is a complete immunity from suit . . . ."  *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009).  Under this doctrine, "[g]overnment officials performing discretionary functions are immune 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The appropriate inquiry is two-pronged and asks (1) whether the official's conduct violated a constitutional right, and (2) whether that right was clearly established such that "a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Lamont*, 637 F.3d at 182. Because police officers in the field must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009), they are entitled to some leeway for the decisions they make.  *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005).  Thus, "[t]he reasonableness of the officer's belief should be judged from [an] on-scene perspective, not with the perfect vision of hindsight."  *Id.*  In short, qualified immunity excuses an officer's reasonable

11

mistake as to what the law requires. *Saucier*, 533 U.S. at 206. "'If officers of reasonable competence could disagree on th[e] issue, immunity should be recognized.'" *Giles*, 571 F.3d 325 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### B. False Arrest and False Imprisonment

The Fourth Amendment states that the people are entitled "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "An arrest by a law enforcement officer without a warrant 'is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.'" *Wright*, 409 F.3d at 601 (quoting *Devenpeck v. Alford*, 543 U.S. 146 (2004)). The evidentiary standard for establishing probable cause is much less stringent than that for obtaining a conviction. *Id.* Indeed, the conception of probable cause has long been recognized as practical and nontechnical, and it is intended to balance the right of the people from unreasonable intrusions with the need of law enforcement officers to perform their duties. *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "A 'common sense approach [must be taken] to the issue of probable cause' and a determination as to its existence must be based on 'the totality of the circumstances.'" *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997)). Probable cause to arrest exists if "at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "In other words, the constitutional validity of the arrest does not depend on whether the suspect actually

committed any crime." *Wright*, 409 F.3d at 602 (citing *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir.2003)).

The *Wright* case is a helpful guide.  There, the plaintiff, Kimberly Wright, was a woman who had been sexually assaulted in a home in Philadelphia.  409 F.3d at 597.  After her attackers forced her out of the house, she returned and broke in to recover her personal belongings and take other items that she believed could be used to identify her attackers.  *Id.*  She later reported the assault to the police, and the owner of the house—who was the sister of one of the attackers—reported the break-in.  *Id.*  A different police officer investigated each alleged crime. *Id.*  Wright told the officer investigating the assault that she had broken into the house to recover items that would prove she had been there; she gave those items to the police, and the police later returned the items to the owner of the house.  *Id.*  During the investigation into the break-in, the investigating officer learned that the owner's brother had brought a woman to the house.  *Id.* The officer found a broken pane of glass and a piece of paper with Wright's name inside the house, and during an interview, the owner's brother acknowledged that he had brought Wright to the house but denied that he had had sex with her.  *Id.*  At some point, the officers learned of each other's investigations.  *Id.* at 598.  Subsequently, the officer investigating the assault determined there was insufficient foundation to proceed, but before that investigation closed, the other officer obtained an affidavit of probable cause to arrest Wright for burglary.  *Id.*  Wright was arrested without a warrant and charged with burglary, theft, and criminal trespass, but all of the charges were later dropped.  *Id.*

The Third Circuit held that the police were entitled to qualified immunity because they had probable cause to arrest Wright for criminal trespass, reversing the decision of the District Court.  *Id.* at 603–04.  The Third Circuit started its analysis with Pennsylvania's criminal

trespass statute, noting that "probable cause exists for an arrest for criminal trespass when the facts and the circumstances are sufficient for a prudent person to believe that the suspect: (1) entered or broke into a building or occupied structure, (2) knowing that she or he had no license or privilege to do so." *Id.* at 603 (citing 18 Pa. Cons. Stat. Ann. § 3503(a)(1)).  Assuming, as it was required to do, that Wright mistakenly believed that she was entitled to break in to the house to retrieve her belongings and physical evidence, the Court nevertheless stated that it was "concerned here only with the question of probable cause, not Wright's guilt or innocence." *Id.* Thus, the question was whether the facts and circumstances presented to the officers justified a reasonable belief on the officers' part that Wright had committed a trespass.  *Id.*  The Court answered in the affirmative, reasoning that the officers did not believe Wright's explanation for the break-in and that, because the probable cause inquiry looks to the totality of the circumstances, they were not required either to correctly resolve conflicting evidence or to make an accurate credibility determination.  *Id.*  In addition, Wright admitted to entering the house, a neighbor identified her, and her name was found on a piece of paper inside the house.  *Id.*  Thus, the Court held that based on the information that was available to the officers at the time, any mistake they made was reasonable.  *Id.*

Another Third Circuit case, *Feldman v. Community College of Allegheny*, is also instructive.  *See* 85 F. App'x 821 (3d Cir. 2004).  In that case, the plaintiff was forcibly removed from a campus computer lab by Pittsburgh police officers and arrested for trespass; he had previously had a dispute with the lab instructor over his contractual right to use the lab.  *Id.* at 824.  The Third Circuit affirmed the District Court's grant of summary judgment in favor of the arresting officers on the plaintiff's false arrest claim.  *Id.* at 825.  It noted that a college security guard had informed the officers that he had told the plaintiff to leave and the plaintiff refused to

comply, and it found that that information was enough to establish probable cause to arrest for defiant trespass. *Id.* Furthermore, the Court rejected the plaintiff's contention that the officers were under a duty to investigate his claim of right to use the computer lab, reasoning that "an officer is not required to 'undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already exists.'" *Id.* (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (E.D. Pa. 1999)); *see also Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986). The Third Circuit approvingly quoted the District Court's conclusion: "[T]here is no question that the police officers were not required or permitted to conduct a trial of the matter on the spot to determine whose interpretation of [the College's] policies was correct, and that there was ample probable cause to arrest this defiant trespasser who refused to obey repeated requests by the owner's agents to leave." *Feldman*, 85 F. App'x at 826.

Turning to the case at hand, the Court concludes that White, Gonzalez, and Barrett had reasonable grounds to believe Bailey had committed a trespass. Thus, they had probable cause to arrest Bailey, there was no constitutional violation, and the officers are entitled to qualified immunity.

Bailey was arrested[5] for "unlicensed entry of structures," which is a species of criminal trespass. N.J.S.A. § 2C:18-3(a); *State v. Braxton*, 330 N.J. Super. 561, 565 n.1 (App. Div. 2000). The statute provides that "[a] person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or surreptitiously remains in any research facility, structure, or separately secured or occupied portion thereof." N.J.S.A. § 2C:18-3(a). It is an affirmative

---

[5] The Englewood defendants contend that Bailey was never actually arrested because she was only stopped for a matter of seconds, she was never handcuffed, and she was never processed. In addition, Bailey testified that she was never arrested. "To constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, [is] sufficient." *California v. Hodari D.*, 499 U.S. 621, 624 (1991). White took hold of Bailey's wrists with lawful authority; therefore, Bailey was arrested.

defense if "[t]he actor reasonably believed that the owner of the structure, or other person empowered to license access thereto, would have licensed him to enter or remain."  N.J.S.A. § 2C:18-3(d).  The elements of the crime are thus nearly identical to Pennsylvania's criminal trespass statute: (1) entering or remaining in a structure (2) with knowledge that such entry is not licensed.  The Englewood police officers therefore are entitled to qualified immunity if "the facts and the circumstances are sufficient for a prudent person to believe that [Bailey]: (1) entered or broke into a building or occupied structure, (2) knowing that she . . . had no license or privilege to do so."  *Wright*, 409 F.3d at 603.

The record, viewed in the light most favorable to Bailey, shows that after White and Gonzalez arrived at the scene, White spoke to Gibbons, who told White that he was the owner of the property and that Bailey was trespassing.  Gibbons then showed White his deed to the property, and White thereafter attempted to speak to Bailey to determine whether she had any documentation establishing her right to be there.  Bailey did not provide any documentation and did not speak to the officers.  When Barrett arrived, White informed him of the pertinent facts, and after asking Gibbons whether he wanted to file a complaint, Barrett instructed White to arrest Bailey.  The information available to the officers at the time—Gibbons's statements, the deed, and Bailey's failure to demonstrate that she was allowed on the property—is sufficient to establish that they had reasonable grounds to believe Bailey's entry into the house was unlicensed and that she knew this to be the case.  Therefore, the officers had probable cause to arrest her.

Bailey prevents several arguments in support of her view that no probable cause existed, none of which are availing.  Her primary probable cause argument proceeds from the contention that she in fact had a right to be on the property on January 14, 2008, because the Escrow

Agreement purportedly gave her that right, so long as she paid $50.94 for each day she occupied the property after the closing date.  Ergo, the police could not possibly have had probable cause to arrest her for trespass.  This line of reasoning confuses the issue.  The question is not whether Bailey was actually guilty or innocent; it is whether the officers, given the facts and circumstances presented to them, reasonably believed they had probable cause to arrest Bailey.  *Wright*, 409 F.3d at 603.  In this connection, whether the Escrow Agreement provided Bailey the right to remain on the property as of January 14 is irrelevant.  It is undisputed that the officers never saw the Escrow Agreement.  While White knew at the time of the arrest that Bailey had been allowed to remain on the property for some period after the closing date, he was not aware of when that period was to end and was not aware of any formal agreement to that effect.  Probable cause is a "totality of the circumstances" inquiry, and taken together with the remainder of the available information, White's knowledge that Bailey had been allowed to stay on the property at some point does not defeat the conclusion that the officers reasonably believed they had probable cause to arrest her.

Bailey also contends that because White knew that Gillert had previously been at the scene (White Dep. 11:1), he had a duty to call back to the police station and investigate what had transpired during the prior incident.  Instead of investigating, Bailey argues, the officers simply took Gibbons at his word that he owned the house and that Bailey was trespassing.  Furthermore, she asserts that Barrett's investigation was inadequate because he did not speak to either of the parties, but acted only on the information White provided to him.  Her contentions are unfounded in law.  As the Third Circuit stated in *Feldman*, an officer on the scene need not undertake an exhaustive investigation and may not conduct a trial of the matter at the scene.  85 F. App'x at 825–26.  Gibbons's statements, the deed, and Bailey's failure to explain her presence were

17

sufficient to establish probable cause, and neither White nor Barrett was obligated to delve

further by investigating Gillert's prior response.

In a related argument, Bailey asserts that Gibbons never actually showed the police his

deed to the property.  This argument has five prongs: (1) Gibbons testified that he did not show

the deed to White during the officer's first visit to the property; (2) Gibbons testified that he only

showed the deed to the police at the police station; (3) the police report made no mention of the

deed; (4) Bailey did not see Gibbons show the officers the deed; and (5) Gibbons only had one

copy of the deed, and that copy was at the County Clerk's office on January 14, 2008, awaiting

recordation.

Gibbons's confusion as to the correct sequence of events notwithstanding,[6] the record

shows that he did in fact show the police the deed at some point before Bailey was arrested.  In

---

[6] The first and second prongs of Bailey's argument relate to a phantom factual dispute she proffers in an effort to defeat summary judgment—her position is that a dispute exists as to how many times the police actually came to the property, when they came to the property, and the correct sequence of events.

According to her submissions, she and Gibbons agree that the police visited the property twice, that they left without arresting her after the first visit, and that they arrested her when they returned.  This view is not supported in the record.  In fact, Bailey testified that the police arrested her during their first visit and that during the second visit, one of the officers helped her find her keys and then left.  (Bailey Dep. 98:2–3, 110:19–25, 111:1–112:15.)  Her testimony largely comports with the version of events offered by the officers.  They stated that they first went to the property at 9:50 a.m., and that during that incident, they arrested Bailey.  Subsequently, at 11:06 a.m., they received a call that Bailey was back at the property, and White and Johnson returned, only to find that no one was there.  (White Interrogs. ¶ 7.)

In his testimony, meanwhile, Gibbons contradicted himself and appeared to mix up the order in which the events of January 14, 2008, occurred.  Under questioning by Bailey's attorney, he first testified that when one of the workers at the property called to tell him Bailey was there, he called the police, took the deed out of his file, and then went to the property to meet the police there.  When he got there, he showed the officers his deed and his driver's license, and told them that he owned the house and that Bailey was trespassing.  The officers then asked him if he wanted to file a complaint against Bailey, he said he did, and the officers began to arrest her before he told them to stop.  (Gibbons Dep. 90:16–102–15.)  However, under questioning by the Englewood defendants' attorney, he later testified that the first call concluded when Bailey grabbed some of her things, got in her car and left.  Gibbons then went home and received another call that Bailey was at the house.  He subsequently went to the Englewood police station, showed the sergeant his deed and told the sergeant he wanted to file a complaint.  Thereafter, he met the officers at the property, where Bailey was looking for her keys; after Bailey and one of the officers walked through the house looking for the keys, they came outside and the officers began to arrest Bailey before Gibbons told them to stop.  (Id. 110:2–122:5.)

Gibbons's recollection of the sequence of events clearly cannot be accurate.  He testified that the officers on the scene when Bailey was arrested were one black officer, one Latino officer, and one white officer of a higher rank than the others.  (Id. 117:20–24.)  This testimony fits a description of White, Gonzalez, and Barrett, and fits

fact, Gibbons testified that he showed the police officers the deed and his driver's license during their first visit to the property. (Gibbons Dep. 92:16–20, 111:5–13, 114:19–115:10.) The testimony that Bailey purports to be an admission that Gibbons did not show the deed during the first visit is not what Bailey claims it is. Gibbons's testimony only reflects that White informed him that Bailey had said Gibbons owned the house. (Bailey Moving Br. at 47–48 (recounting Gibbons's deposition testimony).) Nowhere did Gibbons state that he did not show White the deed. Bailey's assertion that Gibbons testified that he only showed the deed at the police station is also inaccurate, and it is immaterial, as well. Gibbons actually testified that he showed the police officers the deed both at the property and at the police station. (Gibbons Dep. 114:19– 116:7.) In any event, Bailey's contention that Gibbons only showed the deed at the police station merely serves to prove that Gibbons showed the police the deed at some point before her arrest. Furthermore, while Bailey is entitled to all reasonable inferences at the summary judgment stage, White's failure to mention the deed in the police report does not support an inference that he lied about seeing the deed; Gibbons and Barrett both testified that White reviewed the deed, and Barrett stated that he saw the deed, as well. In a similar vein, Bailey's testimony that she did not personally see Gibbons show White the deed cannot support an inference that it did not happen, especially where the remainder of the testimony is to the contrary and there is evidence that Bailey was gathering her belongings while Gibbons was talking to White. Finally, Bailey's assertion that Gibbons testified that he only had one copy of the deed—and that that copy was at

---

Bailey's description of the officers who were on the scene for the first call, when she testified that she was arrested. (Bailey Dep. 98:18–23.) Bailey also testified that two black officers reported to the second call, including the black officer from the first call; she identified Johnson as the other black officer, the one who helped her find her keys. (*Id.* 111:8–111:17, 392:16–19, 395:14–15.) The dispatch reports in the record confirm that White, Gonzalez, and Barrett responded to the first call at 9:50 a.m. and White and Johnson responded to the second call at 11:28 a.m. (Dispatch Reports, attached to Bailey Mot. as Exs. 2, 5.) Therefore, despite Gibbons's confusion, the record shows that Bailey was arrested during the officers' first trip to the property.

the County Clerk's office on January 14, 2008—is not supported in the record, but rather is

based on a misinterpretation of Gibbons's testimony.  Bailey points to a pair of discussions

Gibbons had with her counsel about the deed during his deposition.  The first is as follows:

> Q: There was one deed.  Did you have more than one version of the deed?
> A: Whatever I received in the closing documents is what I have.
> Q: And if you received anything subsequent—I'm sorry.  Do you have a folder of your legal documents?
> A: Yes.
> Q: Have you put everything from this closing in the folder to the best of your knowledge?
> A: Yes.
> Q: Have you discarded anything from that folder since the time of closing?
> A: No.
> Q: So what you delivered [during discovery] was a complete—all of the documents that you have, correct?
> A: Yes.

(Gibbons Dep. 43:20–44:13.)

> Bailey's counsel returned to this line of questioning later on.

> Q: Is that the deed that you showed to the police officers, a copy of it?
> A: I believe it is.
> Q: And you only had one copy of the deed, correct, in your possession, the original, the only—
> A: I already answered the question.

(*Id.* 93:8–14.)  Nowhere in either of these exchanges did Gibbons say he only had one copy of

the deed.  Rather, he testified that he had a folder into which he put all of the documents from the

closing, and he turned all of those documents over to Bailey during discovery.  He also testified

that he showed the police officers a copy of the deed.  It was Bailey's counsel who said there was

only one copy of the deed, not Gibbons.  To the contrary, Gibbons repeatedly confirmed that he

had a copy of the deed with him on January 14, 2008.  To wit, he testified that after he got the

first call from the workers at the property, he went into his file and took the deed out.  (*Id.*

94:21–23.)  In addition, he stated that he was sure he had a deed in his possession and that before

he went to the property on January 14, 2008, he gathered documents, including the deed, that would prove his ownership of the property.  (*Id.* 111:5–13.)

Even if the Court assumes that Gibbons never showed the deed to the police officers, Bailey's assertion that they were not entitled to take Gibbons's word for it is incorrect.  To the contrary, "[w]hen an officer has received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause."  *Gramenos*, 797 F.2d at 439; *see also Merkle*, 211 F.3d at 790.  Even when taken in the light most favorable to Bailey, the evidence shows that Gibbons told the police officers that he owned the property and Bailey was trespassing, and Bailey failed to respond to the officers' questions or provide documentation entitling her to be there.  Therefore, the police officers had reasonable grounds to believe that Bailey was not licensed to be on the property and that she knew she was not licensed to be there.  As such, they had probable cause to arrest Bailey, and because no constitutional violation occurred, they are entitled to qualified immunity.  In addition, because "an arrest based on probable cause [can]not become the source of a claim for false imprisonment," *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (1995) (citing *Baker v. McCollan*, 443 U.S. 137, 143–44 (1979)), the officers are entitled to summary judgment on Bailey's false imprisonment claim, as well.

### C. Excessive Force

A § 1983 claim of excessive force has its roots in the Fourth Amendment as well, specifically that Amendment's bar against unreasonable seizures.  *Lamont*, 637 F.3d at 182.  The task for a plaintiff is to demonstrate that a seizure occurred and that, under the circumstances, the seizure was unreasonable.  *Id.* at 183 (citing *Graham v. Connor*, 490 U.S. 386, 395–96 (1989); *Brower v. County of Inyo*, 489 U.S. 593, 599, (1989)).  "The test of reasonableness under the

Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec v. Tate*, 361 F. 3d 772, 776 (3d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Again, the conduct must be viewed from the vantage point of a reasonable officer on the scene.  *Lamont*, 637 F.3d at 183.  "Monday morning quarterbacking is not allowed."  *Id.*  Factors to be taken into account include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 296.  A lack of physical injury does not conclusively establish that the force used was reasonable, but because the Constitution protects only against the egregious use of force, physical injury is a relevant consideration.  *Kopec*, 361 F. 3d at 776.

The force used to arrest Bailey was minimal.  Bailey testified that White took hold of her wrists and that she did not suffer any injury.  He did not squeeze or punch her wrists, he never handcuffed her, and the incident lasted only a few seconds.  No reasonable officer would have believed White's actions to constitute an excessive use of force, and no reasonable juror would have either.  The officers are therefore entitled to qualified immunity on Bailey's excessive force claim.

### D. Procedural Due Process

Bailey claims that the police officers deprived her of procedural due process by preventing her from using and occupying the house, which she claims was her right under the Escrow Agreement, and by preventing her from claiming her possessions and allowing Gibbons to destroy them.  The Fourteenth Amendment guarantee of procedural due process does not protect against deprivations of property in and of themselves; rather, it protects against such

deprivations that occur "without due process of law." *Parratt v. Taylor*, 451 U.S. 527, 537

(1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986) (quoting *Baker*

*v. McCollan*, 443 U.S. 137, 145 (1979)).  In *Parratt*, the Supreme Court held that in situations

where it is impractical or impossible for a state to provide predeprivation process, such as when a

police officer undertakes a random, unauthorized act, a cause of action for deprivation of

property without due process of law will not lie under § 1983 if the state provides an adequate

postdeprivation remedy.  *Id.* at 538, 541.  In this case, the alleged deprivation did not occur

pursuant to some established state procedure, but was the product of a purported failure by the

police officers to follow the appropriate procedure.  *See supra* Part IV.  The State of New Jersey

provides causes of action for trespass and conversion, N.J.S.A. §§ 2A:14-1, 59:3-1, which Bailey

could have employed.  Indeed, she appears to recognize these available remedies, as she states in

her briefs that the police officers either converted her property or were complicit in Gibbons's

conversion.  (*See* Opp'n Br. to Englewood Defs. at 29–31.)  While Judge Toskos dismissed

Bailey's tort claims against the police officers and the City of Englewood in state court for

failure to file a notice claim as required by the New Jersey Tort Claims Act (June 12, 2009,

Order, attached to Mory Certif. as Ex. C), Bailey nevertheless cannot recover on her procedural

due process claim because the option to sue in tort was available to her.  *See Revell v. Port Auth.*

*of N.Y. & N.J.*, 598 F.3d 128, 139 (3d Cir. 2010), *aff'g* 2009 WL 901855 (D.N.J. Mar. 31, 2009)

(Hayden, J.).  Therefore, the individual officers are entitled to summary judgment on Bailey's

procedural due process claim.

### E. Substantive Due Process

In addition to asserting a violation of her procedural due process rights, Bailey also

asserts that the officers' deprivation of her property violated her substantive due process rights

under the Fourteenth Amendment.[7]   To establish a substantive due process violation predicated

on a deprivation of property, a plaintiff "must show that the actions of the officials 'shock[] the

conscience.'"  *Papaiya v. City of Union City*, 238 F. App'x 848, 850–51 (3d Cir. 2007) (quoting

*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)) (alteration in original).  Only "the

most egregious government conduct" violates substantive due process.  *Lewis*, 523 U.S. at 846.

On the record before the Court, no reasonable jury could find that the officers' conduct violated

Bailey's substantive due process rights.  As discussed above, the officers viewed Gibbons' deed

and had no knowledge of the Escrow Agreement that supposedly gave Bailey the right to stay on

the property.  In addition, Bailey testified that none of the police officers took any of her

personal possessions, and in fact, she was allowed to take many of her belongings with her when

she was told to leave the property.  (Bailey Dep. 130:21–23, 143:11–13, 144:8–19; Gibbons Dep.

114:4–12; Gonzalez Dep. 18:7–13, 23:5–8, 32:10–12; Barrett Dep. 27:1–6; White Interrogs. ¶ 7;

Bailey Reply Certif. of Facts ¶ 114.)  This kind of conduct can hardly be said to be improper, let

alone conscience-shocking.  The Englewood defendants are therefore entitled to summary

judgment on Bailey's substantive due process claim.

### F. Conspiracy

Bailey alleges that the Englewood defendants conspired to deprive her of her

constitutional rights and carried out the conspiracy by filing a false police report.  This claim

invokes 42 U.S.C. § 1985(3), which provides that

---

[7] To the extent Bailey seeks to assert Fourteenth Amendment substantive due process claims based on her arrest and the officers' use of force, they are subsumed under her Fourth Amendment claims.  "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273(1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  The Fourth Amendment provides for protection against false arrest and imprisonment, *Wright*, 409 F.3d at 601, and excessive force, *Graham*, 490 U.S. at 395.

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The elements of a cause of action under § 1985 are "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997). Notably, an action under § 1985 cannot proceed absent evidence of race- or class-based animus, *id.*, and, furthermore, "[b]ecause § 1985 does not itself create any substantive rights but acts as a 'vehicle to vindicate [other] federal rights and privileges,' [a plaintiff] first must establish a violation of [her] constitutional rights in order to have a successful § 1985 claim." *Papaiya*, 238 F. App'x at 851 (quoting *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 805 (3d Cir. 2001)). On this latter point, an official who is immune from suit under § 1983 is also immune from suit under § 1985(3). *Downey v. Coal. Against Rape and Abuse, Inc.*, 143 F. Supp. 2d 423, 453 (D.N.J. 2001).

Bailey's § 1985(3) conspiracy claim must fail for two reasons. First, she has not alleged any race- or class-based animus, and has provided no evidence of it. Her sole argument on this point is the incorrect assertion that "the Constitutional Tort claimed does not require the reliance on the Class status." (Opp'n Br. to Englewood Defs. at 33.) Second, as discussed above, the

Englewood defendants are entitled to summary judgment on Bailey's § 1983 claims.  Therefore, her § 1985(3) claim must fall, as well.

## VI. Rocco's Appeal of the Magistrate Judge's Order

Defendant Rocco appeals Judge Shwartz's order [D.E. 76] denying her motions (1) to disqualify plaintiff's counsel and (2) for leave to amend her answer to assert a third-party complaint against plaintiff's counsel.

Pursuant to L. Civ. R. 72.1(c)(1)(A), "any party may appeal from a Magistrate Judge's determination of a non-dispositive matter," including a motion to disqualify counsel.  *Tare v. Bank of America*, 2009 WL 90326, at *1 (D.N.J. Jan. 13, 2009) (Linares, J.).  On appeal, a district court judge examines whether the magistrate judge's decision is "clearly erroneous or contrary to law."  L. Civ. R. 72.1(c)(1)(A); *Marks v. Struble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004) (Cooper, J.).  The party who filed the appeal bears the burden of establishing that the magistrate judge's decision is clearly erroneous or contrary to law.  *Travelers Indem. Co. v. Dammann & Co.*, 592 F. Supp. 2d 752, 758–59 (D.N.J. 2008) (Debevoise, J.).  "'A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Bobian v. CSA Czech Airlines*, 222 F. Supp. 2d 598, 601 (D.N.J. 2002) (Debevoise, J.) (quoting *Dome Petroleum Ltd. v. Emp'rs Mut. Liab. Ins. Co.*, 131 F.R.D. 63, 65 (D.N.J. 1990)).  "A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law," *id.* (citing *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 162, 164 (D.N.J. 1998)), and "a magistrate's legal conclusions on a non-dispositive motion will be reviewed de novo."  *Doe v. Hartford Life & Accident Ins. Co.*, 237 F.R.D. 545, 548 (D.N.J. 2006) (Linares, J.).

26

Rocco moved below to disqualify plaintiff's counsel, James Marks, because, she claims, he is likely to be a necessary witness at trial.  Her assertion invokes New Jersey Rule of Professional Conduct 3.7, which provides that

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>> (1) the testimony relates to an uncontested issue;
>> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>> (3) disqualification of the lawyer would work substantial hardship on the client.

"The Rule is designed to prevent a situation in which at trial a lawyer acts as an attorney and as a witness, creating the danger that the fact finder (particularly if it is a jury) may confuse what is testimony and what is argument, and otherwise creating an unseemly appearance at trial."  *Main Events Prods., LLC v. Lacy*, 220 F. Supp. 2d 353, 357 (D.N.J. 2002).  Only where an attorney has "crucial information in his possession which may be divulged" will he be deemed "likely to be a necessary witness."  *Garza v. McKelvey*, 1991 WL 3302, *3 (D.N.J. Jan. 2, 1991).

Motions to disqualify counsel are disfavored because they are viewed as drastic measures.  *Carlyle Towers Condo Ass'n, Inc., v. Crossland Savings FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996).  "The party seeking disqualification bears the burden of showing that continued representation by the lawyer would violate the disciplinary rules."  *Oswell v. Morgan Stanley Dean Witter & Co.*, 2007 WL 2446529, at *3 (D.N.J. Aug. 22, 2007).  Furthermore, the movant "must do more than simply make representations that a lawyer is a necessary witness for the attorney to be disqualified."  *Id.*  "Indeed, the party seeking to disqualify must put forth evidence that establishes the likelihood that the attorney will be a necessary witness at trial and if it is unclear from the record as to whether or not the attorney's testimony is necessary, the motion

27

should be denied." *Id.* If the information possessed by the attorney can be introduced through other documents or witnesses, the attorney is not a necessary witness. *Id.* at *4.

In her opinion denying Rocco's motion to disqualify, Judge Shwartz found that there existed ample alternative forms of evidence Rocco could use to establish that Marks "was in a position to have filed a notice of tort claim on behalf of Ms. Bailey," by April 14, 2008, and that such evidence could establish that Rocco did not proximately cause the failure to timely file a notice of claim. (Op. Tr. 24:2–6.) On appeal, Rocco contends that Judge Shwartz failed to recognize that Marks's testimony is vital because it will allow the jury to weigh his credibility. In light of the record evidence on which Judge Shwartz's decision was based, Rocco's argument is unpersuasive. Judge Shwartz pointed to a variety of evidence in the record supporting Rocco's defense, including (1) an email from Marks indicating that he knew Rocco was no longer Bailey's attorney as of December 2007 (before the police incident); (2) Rocco's testimony that her representation of Bailey was limited to marital matters; (3) Rocco's testimony about what she knew about the incident; (4) emails demonstrating that Marks represented Bailey as early as March 2008; and (5) Marks's testimony at the hearing on the motion to disqualify, which Rocco may employ at trial. (Op. Tr. 23–25.) Given this volume of evidence, the Court concludes that Judge Shwartz did not err in concluding that Marks is not a necessary witness, and her denial of Rocco's motion to disqualify Marks is affirmed.

As for Rocco's motion for leave to bring a third-party complaint against Marks, Judge Shwartz treated it as a motion to amend the final pretrial order pursuant to Fed. R. Civ. P. 16 because it was not memorialized therein and was first raised after the final pretrial order had been entered. A final pretrial order may be modified only to prevent manifest injustice. *Pharm. Sales & Consulting Corp. v. J.W.S. Delavau, Co.*, 59 F. Supp. 2d 408, 411 (D.N.J. 1999).

28

Whether manifest injustice exists requires inquiry into eight factors: (1) the prejudice or surprise in fact to the non-moving party; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule would disrupt the orderly and efficient trial of the case; (4) bad faith and willfulness on the part of the movant; (5) the ability of the movant to have discovered witnesses, evidence, claims or defenses earlier; (6) the validity of the excuse offered by the party; (7) the importance of the proffered evidence, claims or defenses; and (8) whether the request to amend is a matter of a new strategy or tactic.  *Scopia Corp. v. Green Tree Mortg. Co.*, 184 F.R.D. 526, 528–29 (D.N.J. 1998).

Judge Shwartz determined that "there is surprise to the opposing party; there has been no mention of how to cure the surprise . . . ; amendment would disrupt the orderly and efficient trial of the case; Rocco could have acted on the evidence underlying the claims earlier; and the importance of the proffered claim is minimal."  (Op. Tr. 30:24–31:6.)  Rocco does not challenge the law Judge Shwartz applied, but does challenge her application of it.  Her contentions, however, are unavailing.

First, while Rocco asserts that there was no surprise because Marks should have known he was potentially liable as a successor attorney, she does not demonstrate any error in Judge Shwartz's finding that Rocco was not given permission to file—and Marks did not expect—a motion for leave to implead him.  Second, Rocco's contention, based on Marks's expressions of confidence in his case, that the surprise can be cured easily by having another attorney step in is devoid of support.  Third, Rocco states that because no trial date has been set, a replacement attorney would have time to "get up to speed" (Appellant's Br. at 16), but this assertion ignores the volume of discovery in this case and the fact that discovery has been completed.  Fourth, Rocco argues that she did not demonstrate bad faith and did not have an opportunity to discover

29

the claim earlier because Bailey's "new" claim was not raised until August 2010, but she does not point to any error in Judge Shwartz's determination that the facts underlying the claim were available to her well before August 2010.  Fifth, Rocco contends that Judge Shwartz made light of the impact of her claim.  She argues that in addition to any proximate cause defense she might have, Marks may be liable for some portion of Bailey's damages under *LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc.*, 340 N.J. Super. 155 (App. Div. 2001).  Notwithstanding, she fails to account for her ability to bring an action for contribution or indemnification.  Finally, she takes issue with Judge Shwartz's determination that the motion for leave to amend "smacks of being sought for tactical purposes," and she points to an example of her accommodation of Bailey's claims.  Nevertheless, she does not adequately explain why, if she learned about the notice of claim issue in August 2010 and had knowledge of facts related to that issue well before then, she declined to seek leave to amend until more than two weeks after the entry of the pretrial order. The Court concludes that Judge Shwartz's decision to deny Rocco leave to amend was not clearly erroneous or contrary to law, and it is affirmed.

## VII. Conclusion

For the foregoing reasons, the summary judgment motion filed by the City of Englewood, Barrett, Gonzalez, and White is granted; Bailey's motion for summary judgment against the City of Englewood, Barrett, Gonzalez, and White is denied; Judge Shwartz's decision to deny Rocco's motions to disqualify counsel and for leave to amend is affirmed; the remainder of the summary judgment motions are denied without prejudice; and the case is remanded to New Jersey state court.  *See Parker*, 620 F.3d at 276 n.2.  An appropriate order will be entered.

                                                    /s/ Katharine S. Hayden
September 12, 2011                                   Katharine S. Hayden, U.S.D.J.